**PAWAR LAW GROUP P.C.**
Vik Pawar, Esq.
20 Vesey Street, Suite 1210
New York, New York 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CALE WATTS, derivatively on behalf of AKERS BIOSCIENCES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JOHN J. GORMALLY, GARY M. RAUCH, RAYMOND F. AKERS, JR., BILL J. WHITE, RICHARD C. TARBOX III, and CHRISTOPHER C. SCHREIBER. <br><br> Defendants, <br><br> and <br><br> AKERS BIOSCIENCES, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY;** <br> **(3) UNJUST ENRICHMENT; AND** <br> **(4) WASTE OF CORPORATE ASSETS** <br><br> <u>JURY TRIAL DEMANDED</u> |

### SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Cale Watts ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Akers Biosciences, Inc. ("Akers" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants John J. Gormally, Gary M. Rauch, Raymond F. Akers, Jr., Bill J. White, Richard C. Tarbox III, and Christopher C. Schreiber. (collectively, the "Individual Defendants" and together with Akers, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Akers, unjust enrichment, waste of corporate

assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Akers, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Akers' directors and officers from May 15, 2017 through the present (the "Relevant Period").

2.      Akers develops, manufactures, and supplies rapid screening and testing products designed to deliver healthcare information to healthcare providers and consumers in the United States, the People's Republic of China, and other nations.

3.      On April 11, 2017, the Company filed its Form 10-K for the fiscal year ended December 31, 2017, which revealed that the Company had "identified a material weakness in [its] controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation."

4.      On June 24, 2017, the Company filed a Schedule 14A with the SEC, which revealed that all of its outside directors, representing four of five sitting board members, were not seeking reelection at the 2017 annual meeting.

2

5.     On May 16 and May 21, 2018, the Company revealed in an NT 10-Q and a Form 8-K filed with the SEC, respectively, that it was "reviewing the characterization of certain revenue recognition items for the quarter ended March 31, 2018," and, as a result, was unable to timely file its Form 10-Q for the fiscal quarter ended March 31, 2018.

6.     On each of these disclosures the price per share of Akers stock dropped, falling $0.021, or nearly 4%, from its May 16, 2018 closing price, to close at $0.509 on May 17, 2018 and falling $0.058, or nearly 9%, from its May 21, 2018 closing price, to close at $0.599 on May 22, 2018.

7.     On May 29, 2018, the Company issued a press release revealing that Company director and founder Defendant Raymond F. Akers ("Akers") had resigned from his position on the Board with immediate effect.

8.     Following this news, the price per share of Akers stock dropped $0.198, or over 33%, from its May 25, 2018 closing price, to close at $0.391 on May 29, 2018, and continued to drop the following day, closing at $0.326 per share on May 30, 2018, a decline of $0.166, or over 16%.

9.     In a Form 8-K filed with the SEC on June 1, 2018, the Company asserted that Defendant Akers had not been cooperative with the Board's review of certain revenue recognition items. An exhibit attached to the Form 8-K reproduced a letter from Defendant Akers that stated he had "resigned from the Board of Directors due to significant differences regarding the policies and practices of the Board of Directors, accounting and business practices of Management, and new Counsel."

10.     The Company filed a Form 8-K/A on June 5, 2018, attaching as an exhibit a letter received from Defendant Akers, through counsel. The letter stated that counsel believed that "the

language of the 8K regarding Ray is false, totally misleading, and such that will cause Ray to have to take corrective action." The letter further asserted that the investigation into revenue recognition was precipitated by Defendant Akers' refusal to approve the Company's Form 10-K for the fiscal year ended December 31, 2018.

11.     In response to this news, the price per share of Akers stock dropped $0.025, or over 5%, from its June 5, 2018 closing price, to close at $0.46 on June 6, 2018.

12.     On June 19, 2018, the Company filed a Form 8-K disclosing that its financial statements filed on Forms 10-Q and 10-K for the fiscal periods ended June 30, September 30, and December 31, 2017 should not be relied upon.

13.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Akers, willfully or recklessly made and/or caused the Company to make false and misleading statements. The false and misleading statements and omissions of material fact failed to disclose that: (1) the Company improperly recognized revenue during the fiscal year ended December 31, 2017 in violation of U.S. Generally Accepted Accounting Principles ("GAAP"); and (2) the Company failed to disclose the true extent of weaknesses in its internal controls over financial reporting, and actively downplayed such weaknesses. As a result, the Company's public statements were materially false and misleading at all relevant times.

14.     During the Relevant Period, when the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make the false and misleading statements discussed herein, the investing public was under a false impression of the Company's business, operations, and financial success.

15.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

17.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), and its Principal Financial Officer ("PFO") to two federal securities fraud class action lawsuits pending in the United States District Court for the District of New Jersey (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, costing the Company millions of dollars.

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Actions, of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Akers. Plaintiff has continuously held Akers common stock at all relevant times. Plaintiff is a citizen of the State of Texas.

### Nominal Defendant Akers

26.     Akers is a New Jersey corporation with its principal executive offices at 201 Grove Road, Thorofare, New Jersey 08086. Akers' shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "AKER."

**Defendant Gormally**

27.     Defendant John J. Gormally ("Gormally") served as the Company's CEO beginning November 2015, and as a Company director beginning August 7, 2017, until he resigned from both positions on October 5, 2018. According to the Company's Schedule 14A filed with the SEC on July 24, 2017 (the "2017 Proxy Statement"), as of July 7, 2017, Defendant Gormally beneficially owned 0.34% of the Company's common stock, which represented approximately 30,230 shares of the Company's outstanding stock as of that date.[1] Given that the price per share of the Company's common stock at the close of trading on July 7, 2017 was $1.20,[2] Gormally owned approximately $36,276 worth of Akers stock. On October 17, 2017, the Company issued Defendant Gormally 150,000 restricted shares of Company stock, increasing his total share ownership of 180,000 shares worth approximately $158,400 based on a closing price per share of $0.88 on October 17, 2017.

28.     For the fiscal year ended December 31, 2016, Defendant Gormally received $311,025 in compensation from the Company. This included $248,500 in salary, $54,725 in stock awards, and $7,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Gormally received $511,915 in compensation from the Company. This included $322,115 in salary, $50,000 in cash bonus, $132,000 in stock awards, and $7,800 in all other compensation.

---

[1] Based on 8,891,245 reported shares outstanding as of July 7, 2017.
[2] Share values as alleged throughout this Complaint are not adjusted to account for a 1 for 8 reverse stock split which occurred on November 8, 2018.

29.     The Company's 2017 Proxy Statement stated the following about Defendant Gormally:

> **John J. Gormally**[3] has served as the Company's Chief Executive Officer since appointed to the position on November 16, 2015. Mr. Gormally has over 30 years of experience as a member of senior management in the healthcare industry. He joined Becton, Dickinson and Company ("Becton"), a medical technology company that manufactures and sells a range of medical supplies and diagnostic equipment, in 1978 as a senior sales representative. Mr. Gormally served in a wide range of positions with Becton through 2013, focusing primarily on commercialization of Becton's products and fostering sales growth. From 1999 to 2001, Mr. Gormally served as the Vice President of U.S. Sales and Operations for ConvaTec, a former division of Bristol-Myers Squibb Company. From 2001 to 2002, he served as the Vice President of Global Sales and Marketing for BEI Medical Systems Company, Inc., prior to rejoining Becton from 2002 to 2013. In 2013, Mr. Gormally founded Gormally Elite Medical LLC, a healthcare consulting firm that specializes in human resources and developing go-to-market commercialization strategies.
>
> Mr. Gormally earned an undergraduate degree from DeSales University in 1978 and is currently an MBA candidate at Northeastern University.
>
> Mr. Gormally was selected to serve on the Board in part because of his significant experience running companies operating in the medical device area.

30.     Defendant Gormally is a citizen of the State of New Jersey.

**Defendant Rauch**

31.     Defendant Gary M. Rauch ("Rauch") has served as the Company's Treasurer since 2013 and as its Vice President, Finance since February 2014, and as such, is the Company's principal accounting officer.[4] According to the 2017 Proxy Statement, as of July 7, 2017, Defendant Rauch beneficially owned 0.48% of the Company's common stock, which represented approximately 42,678 shares of the Company's outstanding stock as of that date.[5] Given that the price per share of the Company's common stock at the close of trading on July 7, 2017 was $1.20,

---

[3] Emphasis in original unless otherwise noted throughout.
[4] Defendant Rauch initially served as the Company's Treasurer as a non-employee consultant. He became an employee of Akers on February 2, 2014.
[5] Based on 8,891,245 reported shares outstanding as of July 7, 2017.

Rauch owned approximately $51,213 worth of Akers stock. On October 17, 2017, the Company issued Defendant Rauch 36,277 restricted shares of Company stock, worth approximately $31,923 based on a closing price per share of $0.88 on October 17, 2017.

32.     For the fiscal year ended December 31, 2016, Defendant Rauch received $95,000 in compensation from the Company in the form of salary. For the fiscal year ended December 31, 2017, Defendant Rauch received $161,855 in compensation from the Company. This included $111,031 in salary, $18,900 in cash bonus, and $31,924 in stock awards.

33.     The Company's website stated the following about Defendant Rauch:[6]

Gary Rauch has over 35 years of experience in accounting, financial and information systems consulting, discrete manufacturing, distribution and administration. He founded DataSys Solutions, LLC in 2004 specializing in financial and information systems consulting and technical support services. From 2002-2010, he was the controller for Cold Star, Inc., a manufacturer of dairy dispensing equipment and a dairy products distributor. Gary served as Vice President of Information Systems for FYI, Inc. from 1992-2001, with responsibility for software design and development and other technical services to more than 600 hospitals utilizing FYI's medical copy services. He was a consulting manager with Deloitte Touche from 1986-1992, providing financial system selection, development and implementation services for their small to middle market clients.

34.     Defendant Rauch is a citizen of the State of New Jersey.

**Defendant Akers**

35.     Defendant Raymond F. Akers, Jr., Ph.D. ("Akers") founded the Company in 1989, and served Executive Chairman of the Board from December 2009 through April 2016 when he resigned as Executive Chairman, was appointed the Company's Chief Scientific Director, and remained on as a director. He was appointed as the Company's Secretary on August 2013. Defendant Akers was re-appointed Executive Chairman on August 10, 2017. On April 25, 2018 the Board terminated Defendant Akers' positions as Executive Director, Secretary, and Chief

---

[6] *Board, Senior Management and Medical Advisors*, AKERS BIO, http://www.akersbio.com/about/board-senior-management-and-medical-advisors/senior-management (last visited June 21, 2018).

Scientific Director, although Defendant Akers continued on as a director. On May 27, 2018, Defendant Akers resigned from the Company's board of directors. The Company clarified on June 5, 2018 that Defendant Akers' resignation was the result of disagreements with the Company concerning, *inter alia*, its accounting and business practices.

36.     For the fiscal year ended December 31, 2016, Defendant Akers received $277,031 in compensation from the Company, comprised of $269,231 in salary, and $7,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Akers received $296,262 in compensation from the Company, comprised of $288,642 in salary, and $7,800 in all other compensation.

37.     The Company's 2017 Proxy Statement stated the following about Defendant Akers:

**Raymond F. Akers Jr., Ph.D.** served as Executive Chairman of the Board from December 31, 2009 through April 22, 2016 when he resigned as Executive Chairman and was appointed as the Company's Chief Scientific Director while also remaining a director of the Company. Additionally, Dr. Akers has served as Secretary of the Company since his appointment to the position on August 5, 2013. Dr. Akers founded the Company in 1989. He has over 30 years of experience in the diagnostics industry having co-founded Drug Screening Systems, Inc., a publicly listed company, in 1987, and Akers Medical Technology Inc. in 1984. He was Chief Executive Officer and Vice President of Research and Development of Drug Screening Systems, Inc. until the sale of that company in 1989 and served as President and Chief Executive Officer of Akers Medical Technology Inc. until 1987.

Dr. Akers holds a Ph.D. in Neurochemistry from Northwestern University. Dr. Akers has either invented or directed the research and development of all of the Company's products and technologies.

Dr. Akers was selected to serve on the Board because of his experience in assisting diagnostic companies develop infrastructure, including but not limited to general management and business development.

38.     Defendant Akers is a citizen of the State of New Jersey.

**Defendant Schreiber**

39.     Defendant Christopher C. Schreiber ("Schreiber") has served as a Company director since August 7, 2017, and is a member of the Audit Committee.

40.     The Company's 2017 Proxy Statement stated the following about Defendant Schreiber:

> **Christopher C. Schreiber** combines over 30 years of experience in the securities industry. As the Managing Director of Capital Markets at Taglich Brothers, Inc., Mr. Schreiber builds upon his extensive background in capital markets, deal structures, and syndications. Prior to his time at Taglich Brothers, he was a member of the board of directors of Paulson Investment Company, a 40-year-old full service Investment Banking firm. In addition, Mr. Schreiber serves has a director and partner of Long Island Express North, an elite lacrosse training organization for teams and individuals. He also volunteers on the board of directors for Fox Lane Youth Lacrosse, a community youth program.
>
> Mr. Schreiber is a graduate of John Hopkins University, where he received a Bachelor's Degree in Political Science.
>
> Mr. Schreiber was selected to serve on the Board in part because of his significant experience in capital markets and knowledge of the Company.

41.     Upon information and belief, Defendant Schreiber is a citizen of the State of New York.

**Defendant Tarbox**

42.     Defendant Richard C. Tarbox III ("Tarbox") served as a Company director from August 7, 2017 to October 18, 2018, and was a member of the Audit Committee. The Board appointed Defendant Tarbox as the Company's interim Non-Executive Chairman of the Board effective April 25, 2018.

43.     The Company's 2017 Proxy Statement stated the following about Defendant Tarbox:

> **Richard C. Tarbox III** combines over 40 years of management experience in the medical device and diagnostics sector of the healthcare industry. Mr. Tarbox presently serves as a registered investment banker at Aquilo Partners, L.P., focusing his practice on the needs of clients in the life science tools and diagnostics sectors.

Previously, he held executive roles, primarily in business development and operations management, with Becton Dickinson, Thermo Fisher Scientific and Cardinal Health, Baxter International Inc. and American Hospital Supply Corporation. He has also served a number of companies in the industry as an officer and member of the board of directors including; Alverix, Inc., as Chief Executive Officer and board member from 2010 to 2014, Quidel Corporation, as Corporate Development Officer from 2007 to 2009, ClearData Networks, as Chief Operating Officer and a board member from 1999 to 2001, Bioseparations Inc., as Chief Executive Officer and a board member from 1995 to 1998, Metrika Laboratories, as a board member from 1994 to 1995, DenOptix, Inc., as a board member from 1995 to 1998 and Ostex International Inc., as Chief Operating Officer from 1992 to 1995. Mr. Tarbox currently serves as a member of the advisory boards of Qorvo Inc. and Safeguard Scientifics, Inc.

Mr. Tarbox is a graduate of the University of Washington, where he received his Bachelor's Degree in Clinical Psychology and the Kellogg School of Management at Northwestern University where he earned a Master's degree in Business Management.

Mr. Tarbox was selected to serve on the Board in part because of his significant experience in the medical device and diagnostics industry, as well as his management experience.

44.     Upon information and belief, Defendant Tarbox is a citizen of the State of Arizona.

**<u>Defendant White</u>**

45.     Defendant Bill J. White ("White") has served as a Company director since August 7, 2017, and Chairs the Audit Committee.

46.     The Company's 2017 Proxy Statement stated the following about Defendant White:

**Bill J. White** has more than 30 years of experience in financial management, operations and business development. He currently serves as Chief Financial Officer, Treasurer and Secretary of Intellicheck Mobilisa, Inc., a technology company listed on the NYSE MKT. Prior to working at Intellicheck Mobilisa, Inc., he served 11 years as the Chief Financial Officer, Secretary and Treasurer of FocusMicro, Inc. ("FM"). As co-founder of FM, Mr. White played an integral role in growing the business from the company's inception to over $36 million in annual revenue in a five-year period. Mr. White has broad domestic and international experience including managing rapid and significant growth, import/export, implementing tough cost management initiatives, exploiting new growth opportunities, merger and acquisitions, strategic planning, resource allocation, tax compliance and organization development. Prior to co-founding FM, he served 15

years in various financial leadership positions in the government sector. Mr. White started his career in Public Accounting.

Mr. White holds a Bachelor of Arts in Business Administration from Washington State University and is a Certified Fraud Examiner.

Mr. White was selected to serve on the Board in part because of his significant financial and accounting experience with public companies.

47.     Upon information and belief, Defendant Schreiber is a citizen of the State of Washington.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers and/or directors of Akers and because of their ability to control the business and corporate affairs of Akers, the Individual Defendants owed Akers and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Akers in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Akers and its shareholders so as to benefit all shareholders equally.

49.     Each director, officer, and controller of the Company owes to Akers and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Akers, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

51.     To discharge their duties, the officers, directors, and controllers of Akers were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Akers, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Akers' Board at all relevant times.

53.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

54.     To discharge their duties, the officers and directors of Akers were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Akers were required to, among other things:

        (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New Jersey and the United States, and pursuant to Akers' own Code of Ethics;

        (b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        (c)     remain informed as to how Akers conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

        (d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Akers and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

        (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Akers' operations would comply with all applicable laws and Akers' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

        (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.      Each of the Individual Defendants further owed to Akers and the shareholders the duty of loyalty requiring that each favor Akers' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Akers and were at all times acting within the course and scope of such agency.

57.      Because of their advisory, executive, managerial, directorial, and controlling positions with Akers, each of the Individual Defendants had access to adverse, non-public information about the Company.

58.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Akers.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Akers was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Akers, and was at all times acting within the course and scope of such agency.

## AKERS' CODE OF ETHICS

64.     The Company's Code of Ethics provides that:

the Company's Board of Directors ("**Board**"), Chief Executive Officer ("**CEO**"), Chief Financial Officer ("**CFO**"), principal accounting officer or controller (or persons performing similar functions) and all employees adhere to, advocate and promote the following principles:

1. Loyalty to the interests of our shareholders, customers, suppliers, fellow employees, strategic partners and other business associates;

2. Honest and ethical conduct in any action, practice or course of conduct within the Company or with its business partners;

3. Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

4. Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission (the "SEC" or "Commission") and other public communications made by the Company; and

5. Compliance with laws, rules and regulations applicable to the Company.

65.     The Code of Ethics provides, as to "Reporting and Treatment of Violations," that:

A waiver of a provision of this Code of Ethics shall be requested whenever there is reasonable likelihood that a contemplated action will violate the Code of Ethics. Any waiver (including an implicit waiver) that constitutes a material departure from a provision of this Code of Ethics shall be publicly disclosed on a timely basis, to the extent required by applicable rules and regulations of the SEC. In addition, any amendments to this Code of Ethics (other than technical, administrative or other nonsubstantive amendments) shall be publicly disclosed on a timely basis, to the extent required by applicable rules and regulations of the [S]EC.

66.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, or report violations of the Code of Ethics.

## AKERS' AUDIT COMMITTEE CHARTER

67.     The Company's Audit Committee Charter provides that the Audit Committee's "primary duties and responsibilities" include, *inter alia*:

A. Monitor the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance.

B. Monitor the independence and performance of the Company's independent auditors and the Company's accounting personnel.

C. Provide an avenue of communication among the independent auditors, management, the Company's accounting personnel, and the Board.

D. Appoint and provide oversight for the independent auditors engaged to perform the audit of the financial statements.

E. Discuss the scope of the independent auditors' examination.

F. Review the financial statements and the independent auditors' report.

G. Review areas of potential significant financial risk to the Company.

H. Monitor compliance with legal and regulatory requirements.

I. Solicit recommendations from the independent auditors regarding internal controls and other matters.

J. Make recommendations to the Board.

K. Resolve any disagreements between management and the auditors regarding financial reporting.

L. Prepare the report required by Item 407(d) of Regulation S-K, as required by the rules of the Securities and Exchange Commission (the "**SEC**") . . .

68. The Audit Committee Charter provides that "[t]he committee has the authority to conduct any investigation appropriate to fulfilling its responsibilities."

69. The Audit Committee Charter outlines the responsibilities and duties of the Audit Committee, including the following related to review procedures:

A. Review the Company's annual audited financial statements prior to distribution. Review should include discussion with management and independent auditors of significant issues regarding accounting principles, practices, and judgments.

B. In consultation with the management, the independent auditors, and the Company's principal accounting officer, consider the integrity of the Company's financial reporting processes and controls, including any major issues as to the adequacy of the Company's internal controls, and any special steps adopted in light of any identified material control deficiencies. Discuss significant financial risk exposures and the steps management has taken to monitor, control, and report such exposures. Review significant findings prepared by the independent auditors and the Company's principal accounting officer together with management's responses.

C. The Committee shall review with the management and the independent auditors any correspondence with regulators and any published reports that raise material issues regarding the Company's accounting policies.

70. Regarding the Audit Committee's responsibilities and duties relating to the accounting department and legal compliance, the Audit Committee Charter provides, in relevant part:

The Committee shall:

A. Review the personnel activities and qualifications of the Company's accounting personnel, as needed.

B. Review the appointment and performance of the principal accounting officer, and review financial and accounting personnel succession planning with the Company.

C. Review significant reports prepared by the Company's principal accounting officer together with management's response and follow-up to these reports.

D. On at least an annual basis, review with the Company's counsel any legal matters that could have a significant impact on the Company's financial statements, the

Company's compliance with applicable laws and regulations, and inquiries received from regulators or governmental agencies.

E. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

F. The Committee shall review the CEO and CFO's disclosure and certifications under Sections 302 and 906 of the Sarbanes-Oxley Act.

G. Conduct an appropriate review of and approve all related party transactions on an ongoing basis and the Audit Committee shall review potential conflict of interest situations where appropriate.

H. Conduct an annual risk review with respect to the matters within the role and the responsibilities of the Committee.

71.     In contravention of their duties as members of the Audit Committee, Defendants White, Tarbox, and Schreiber failed to oversee the integrity of the Company's financial statements and allowed the Company to operate with inadequate internal controls, resulting in improper revenue recognition which required an investigation overseen by the Audit Committee to review of certain revenue recognition items with respect to the fiscal quarter ended March 31, 2018, as well as previous quarters.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

72.     Akers develops, manufactures, and supplies rapid screening and testing products designed to deliver healthcare information to healthcare providers and consumers in the United States, the People's Republic of China, and other nations.

73.     The Company filed its annual report for the fiscal year ended December 31, 2016 with the SEC on Form 10-K on April 11, 2017 (the "2016 10-K), signed by defendants Gormally, Rauch, and Akers.

74.     The 2016 10-K asserted that:

[W]e identified a material weakness in our controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation.

The Company's management is composed of a small number of professionals resulting in a situation where limitations on segregation of duties exists. Accordingly, as a result of the material weakness identified above, we have concluded that the control deficiencies result in a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented on a timely basis by the Company's internal controls. The Company has committed to hiring a Financial Controller during the year ending December 31, 2017 which will allow for a higher level of segregation and improve the Company's overall compliance with COSO.

***While the material weakness set forth above were the result of the scale of our operations and are intrinsic to our small size, the Company believes the risk of material misstatements relative to financial reporting are minimal***.

(Emphasis added.)

75.     The 2016 10-K continued, stating that "[t]here were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

76.     In the Company's 2017 Proxy Statement, it was revealed that incumbent Directors "Thomas Knox, Brandon Knox, Robert Andrews and Raza Bokhari are not seeking reelection." As a result, Defendant Akers was the only continuing director following the 2017 annual meeting held on August 7, 2017.

77.     During the Relevant Period, the Company engaged in significant capital raising activities. As Defendant Rauch stated on a conference call held with analysts and investors on April 3, 2018, the Company raised "net proceeds of $10.5 million during [2017] from public offerings, private placements and the execution of warrants."

78.     These capital raising activities included a $6.9 million public offering which closed on or about December 21, 2017, in which the underwriters fully exercised the over-allotment option, and a separate offer of warrants to purchase 2,172,600 shares of common stock.

**Failure to Hold Stockholders' Meeting**

79.     The annual meeting of shareholders of Akers was last held on August 7, 2017.

80.     Section 2.2 of Article II of the Company's Amended and Restated Bylaws states, "Subject to the rights of holders of any series of Preferred Stock, the annual meeting of shareholders for the election of directors and for the transaction of any other proper business shall be held on the date and at the time fixed, from time to time, by the person or persons set forth in the Certificate of Incorporation."

81.     Pursuant to New Jersey Revised Statutes ("N.J. Rev. Stat.") § 14A:5-2, Akers is required to hold an annual meeting of stockholders at least once every 13 months:

> ***An annual meeting of the shareholders shall be held at such time as may be provided in the by-laws***, or as may be fixed by the board pursuant to authority granted in the by-laws, ***and, in the absence of such a provision, at noon on the first Tuesday of April***. Failure to hold the annual meeting at the designated time, or to elect a sufficient number of directors at such meeting or any adjournment thereof, shall not affect otherwise valid corporate acts or work a forfeiture or dissolution of the corporation. If the annual meeting for election of directors is not held on the date designated therefor, the directors shall cause the meeting to be held as soon thereafter as convenient. ***If there is a failure to hold an annual meeting for a period of 30 days after the date designated therefor, or if no date has been designated for a period of 13 months after the organization of the corporation or after its last annual meeting, the Superior Court may, upon the application of any shareholder, summarily order the meeting or the election***, or both, to be held at such time and place, upon such notice and for the transaction of such business as may be designated in such order. At any meeting ordered to be called pursuant to this section, the shareholders present in person or by proxy and having voting powers shall constitute a quorum for the transaction of the business designated in such order.

(Emphasis added.)

82.     In violation of New Jersey law, the Individual Defendants caused the Company to fail to hold its annual stockholders' meeting for over 13 months.

83.     As of the date of filing this Complaint, the Company has not even provided stockholders notice of the next annual stockholders' meeting.

84.     In causing the Company to fail to hold the annual stockholders' meeting, the Defendants prevented the stockholders from having the opportunity to elect a Board of Directors that is not breaching its fiduciary duties to the Company and the stockholders.

**False and Misleading Statements**

85.     The Company filed a quarterly report on Form 10-Q with the SEC on May 15, 2017 (the "Q1 2017 10-Q") for the first quarter ended March 31, 2017, signed by Defendants Gormally and Rauch.

86.     The Q1 2017 10-Q contained the following statements regarding the Company's internal controls:

**Item 4. Controls and Procedures.**

***(a) Evaluation of Disclosure Controls and Procedures.***

Pursuant to Rule 13a- 15(b) under the Exchange Act, the Company carried out an evaluation, with the participation of the Company's management, including the Company's Principal Executive Officer ("PEO") and Principal Financial Officer ("PFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report.

As of March 31, 2017 and based upon that evaluation, the Company's PEO and PFO concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act, are recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Company's PEO and PFO, as appropriate, to allow timely decisions regarding required disclosure.

***(b) Changes in Internal Control over Financial Reporting.***

There were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to

materially affect, our internal control over financial reporting.

87.    Attached to the Q1 2017 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gormally and Rauch, attesting to the accuracy of the Q1 2017 10-Q.

88.    The Company issued a press release on May 16, 2017, titled "Akers Biosciences Announces Q1 2017 Earnings." Regarding Akers' revenues, the press release stated, in relevant part:

> *Q1 Financial Highlights:*
>
> - Total revenue $667,250 (Q1 2016: $738,023)
>
>   o  Revenue from flagship PIFA Heparin PF/4 Rapid Assay
>      products $560,921 -- up slightly on the prior quarter (Q4 2016: $548,068)
>      (Q1 2016: 635,173 -- Q1 2016 sales included higher rebates which were
>      renegotiated April 1, 2016 -- the gross profit per test remained consistent in
>      Q1 2017 despite lower revenues)

89.    On August 3, 2017, the Company issued a press release titled "Akers Biosciences Announces Second Quarter Trading Update," lauding the Company's sales and revenue performance in the quarter ended June 30, 2017. The press release stated, in relevant part:

> THOROFARE, NJ -- (Marketwired) -- 08/03/17 -- Akers Biosciences, Inc. (NASDAQ: AKER) (AIM: AKR.L), ("Akers Bio" or the "Company"), a developer of rapid health information technologies, announces that sales in the second quarter ended June 30, 2017 were among the strongest since the Company's admission to NASDAQ Capital Market in 2014.
>
> ***The Company recorded revenues of approximately $1.2 million over the three-month period, representing an increase of approximately 25 percent over the second quarter of 2016, and a 1.8 times increase over the first quarter of 2017.*** Revenues were derived from product sales in all key geographic regions (U.S., China and Rest of World) and were comprised of sales across Akers Bio's core commercialized product lines including components associated with the Company's PIFA Heparin/PF4 Rapid Assay products for sale internationally, and MPC breathalyzer based products.

(Emphasis added.)

90. On July 24, 2017, the Company issued the 2017 Proxy Statement. Defendants Akers, Gormally, White, Tarbox and Schreiber solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

91. The 2017 Proxy Statement stated, regarding the Company's Code of Ethics, that:

> The Board has adopted a Code of Business Ethics and Conduct (the "Code of Conduct") which constitutes a "code of ethics" as defined by applicable SEC rules and a "code of conduct" as defined by applicable NASDAQ rules. ***We require all employees, directors and officers, including our principal executive officer and principal financial officer, to adhere to the Code of Conduct in addressing legal and ethical issues encountered in conducting their work. The Code of Conduct requires that these individuals avoid conflicts of interest, comply with all laws and other legal requirements, conduct business in an honest and ethical manner and otherwise act with integrity***. The Code of Conduct is available on our website at *www.akersbio.com.* The Company will post any amendments to the Code of Conduct, as well as any waivers that are required to be disclosed by the rules of the SEC on such website. Information contained on our website is not a part of, and is not incorporated into, this proxy statement, and the inclusion of our website address in this proxy statement is an inactive textual reference only.

(Emphasis added in bold & italics, italic web address in original.)

92. The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as multiple Individual Defendants allowed false and misleading statements to be issued to the investing public, and failed to comply with laws and regulations, or conduct business in an honest and ethical manner.

93. The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including an "a meaningful portion of their compensation 'at risk' in the

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

form of equity awards covering the shares of a Company" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

94.     The 2017 Proxy Statement also failed to disclose that: (1) the Company improperly recognized revenue during the fiscal year ended December 31, 2017 in violation of GAAP; (2) the Company failed to disclose the true extent of weaknesses in its internal controls over financial reporting, and actively downplayed such weaknesses; and (3) as a result, the Individual Defendants' statements about the Company's business, operations and prospects were materially false and misleading or lacked a reasonable basis at all relevant times.

95.     The Company filed a quarterly report on Form 10-Q with the SEC on August 14, 2017 (the "Q2 2017 10-Q") for the quarter ended June 30, 2017, signed by Defendants Gormally and Rauch.

96.     The Q2 2017 10-Q included the following table providing the Company's unaudited statements of operations:

### AKERS BIOSCIENCES, INC. AND SUBSIDIARIES
#### Condensed Consolidated Statements of Operations and Comprehensive Loss (unaudited)

|  | Three months ended June 30, | | Six months ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2017 | 2016 | 2017 | 2016 |
| Revenues: | | | | |
| Product Revenue | $1,097,295 | $  956,486 | $ 1,740,481 | $ 1,694,510 |
| Product Revenue - Related party | 100,567 | - | 124,631 | - |
| Total Revenues | 1,197,862 | 956,486 | 1,865,112 | 1,694,510 |
| Cost of Sales: | | | | |
| Product Cost of Sales | (264,231) | (276,848) | (522,952) | (476,876) |
|  | | | | |
| Gross Income | 933,631 | 679,638 | 1,342,160 | 1,217,634 |
|  | | | | |
| Administrative Expenses | 829,929 | 816,244 | 1,620,457 | 1,739,806 |
| Sales and Marketing Expenses | 354,889 | 513,430 | 911,545 | 1,238,754 |

| | | | | |
|---|---|---|---|---|
| Sales and Marketing Expenses - Related Party | 61,502 | - | 93,781 | - |
| Research and Development Expenses | 290,841 | 321,989 | 639,283 | 685,280 |
| Research and Development Expenses - Related Party | 22,994 | - | 22,994 | - |
| Amortization of Non-Current Assets | 42,777 | 42,777 | 85,554 | 85,554 |
| | | | | |
| Loss from Operations | (669,301) | (1,014,802) | (2,031,454) | (2,531,760) |
| | | | | |
| Other (Income)/Expenses | | | | |
| Foreign Currency Transaction (Gain)/Loss | 978 | 2,562 | (9,367) | 4,817 |
| Interest and Dividend Income | (3,632) | (8,432) | (6,169) | (18,716) |
| Other Income | - | - | - | - |
| Total Other Income | (2,654) | (5,870) | (15,536) | (13,899) |
| | | | | |
| Loss Before Income Taxes | (666,647) | (1,008,932) | (2,015,918) | (2,517,861) |
| | | | | |
| Income Tax Benefit | - | - | - | - |
| | | | | |
| Net Loss | (666,647) | (1,008,932) | (2,015,918) | (2,517,861) |
| | | | | |
| Other Comprehensive Income/(Loss) | | | | |
| Net Unrealized Gain/(Loss) on Marketable Securities | 852 | (2,006) | 1,009 | 6,528 |
| Total Other Comprehensive Income/(Loss) | 852 | (2,006) | 1,009 | 6,528 |
| | | | | |
| Comprehensive Loss | $ (665,795) | $(1,010,938) | $(2,014,909) | $(2,511,333) |
| | | | | |
| Basic and diluted loss per common share | $ (0.08) | $ (0.19) | $ (0.25) | $ (0.46) |
| | | | | |
| Weighted average basic and diluted common shares outstanding | 8,882,326 | 5,427,261 | 7,943,168 | 5,426,153 |

97.    The Q2 2017 10-Q provided the following breakdown of revenue by product lines and geographic region:

The total revenue by different product lines was as follows:

| Three months ended June 30, | Six months ended June 30, |
|---|---|
| | |

| Product Line | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| MicroParticle Catalyzed Biosensor ("MPC") | $ 191,816 | $ 44,918 | $ 277,475 | $ 109,702 |
| Particle ImmunoFiltration Assay ("PIFA") | 426,747 | 879,081 | 987,668 | 1,514,256 |
| Other | 579,299 | 32,487 | 599,969 | 70,552 |
| Total Revenue | $ 1,197,862 | $ 956,486 | $ 1,865,112 | $ 1,694,510 |

The total revenue by geographic area determined based on the location of the customers was as follows:

| Geographic Region | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| United States | $ 512,395 | $ 452,756 | $ 1,129,619 | $ 1,118,961 |
| People's Republic of China | 603,068 | 473,853 | 627,132 | 506,398 |
| Rest of World | 82,399 | 29,877 | 108,361 | 69,151 |
| Total Revenue | $ 1,197,862 | $ 956,486 | $ 1,865,112 | $ 1,694,510 |

98.     The Q2 2017 10-Q contained the following statements regarding the Company's internal controls:

**Item 4. Controls and Procedures.**

*(a) Evaluation of Disclosure Controls and Procedures.*

Pursuant to Rule 13a- 15(b) under the Exchange Act, the Company carried out an evaluation, with the participation of the Company's management, including the Company's Principal Executive Officer ("PEO") and Principal Financial Officer ("PFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report.

As of June 30, 2017 and based upon that evaluation, the Company's PEO and PFO concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act, are recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Company's PEO and PFO, as appropriate, to allow timely decisions regarding required disclosure.

*(b) Changes in Internal Control over Financial Reporting.*

There were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

99.     Attached to the Q2 2017 10-Q were SOX certifications signed by Defendants Gormally and Rauch, attesting to the accuracy of the Q2 2017 10-Q.

100.     On August 15, 2017, the Company held a conference call with analysts and investors to discuss its financial results for the quarter ended June 30, 2017. During the call, Defendant Gormally stated that the Company's "campaign of growing towards profitability continued in 2Q with increases of 25% in total revenues to approximately 1.2 million and growth of 10% for the first half of 2017 to approximately 1.9 million in sales."

101.     The Company also issued a press release on August 15, 2017, titled "Akers Biosciences Announces Q2 2017 Earnings." The press release stated that, for the quarter, "[t]otal revenues [were] up 25% for Q2 2017 to $1,197,862 (Q2 2016: $954,486)."

102.     The August 15, 2017 press release quoted Defendant Gormally as stating, in relevant part:

> We are pleased to report growth of 25% in total revenues for the second quarter of 2017 to approximately $1.2 million; and 10% for the first half to approximately $1.9 million. The significant majority of these revenues continued to be generated from sales of our current flagship test -- or associated components thereof -- for an allergy to the widely-used blood thinner, heparin.
>
> * * *
>
> *Outlook*
>
> We are especially encouraged by the 25% increase in revenue in Q2 year-over-year; and the 1.8-fold increase over Q1 2017.

103.     Regarding revenues, the August 15, 2017 press release reiterated that "Akers' revenue for the three months ended June 30, 2017 totaled $1,197,862, a 25% increase from the same period in 2016." The press release also contained tables reproducing substantially the same

information as provided in the Q2 2017 10-Q regarding the Company's revenues by product line and geographic region.

104.    The Company filed a quarterly report on Form 10-Q with the SEC on November 14, 2017 (the "Q3 2017 10-Q") for the quarter ended September 30, 2017, signed by Defendants Gormally and Rauch.

105.    The Q3 2017 10-Q included the following table providing the Company's unaudited statements of operations:

### AKERS BIOSCIENCES, INC. AND SUBSIDIARIES
### Condensed Consolidated Statements of Operations and Comprehensive Loss
### (unaudited)

| | Three months ended September 30, | | Nine months ended September 30, | |
| | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| Revenues: | | | | |
| Product Revenue | $ 638,331 | $ 613,198 | $ 2,378,811 | $ 2,307,328 |
| Product Revenue - Related parties | - | - | 124,631 | 380 |
| License & Service Revenue | 37,500 | - | 37,500 | - |
| Total Revenues | 675,831 | 613,198 | 2,540,942 | 2,307,708 |
| Cost of Sales: | | | | |
| Product Cost of Sales | (323,527) | (236,700) | (846,487) | (713,576) |
| | | | | |
| Gross Income | 352,304 | 376,498 | 1,694,455 | 1,594,132 |
| | | | | |
| Administrative Expenses | 819,565 | 558,293 | 2,440,023 | 2,298,099 |
| Sales and Marketing Expenses | 342,763 | 408,248 | 1,254,308 | 1,647,003 |
| Sales and Marketing Expenses - Related Party | 34,328 | 117,949 | 128,108 | 117,949 |
| Research and Development Expenses | 290,447 | 247,578 | 929,730 | 932,858 |
| Research and Development Expenses - Related Party | - | - | 22,994 | - |
| (Reversal of Allowance for) Bad Debt Expenses- Related parties | - | (1,299,609) | - | (1,299,609) |

| | | | | |
|---|---:|---:|---:|---:|
| Amortization of Non-Current Assets | 42,777 | 42,777 | 128,331 | 128,331 |
| (Loss)/Income from Operations | (1,177,576) | 301,262 | (3,209,039) | (2,230,499) |
| Other (Income)/Expenses | | | | |
|   Foreign Currency Transaction (Gain)/Loss | 3,195 | (3,629) | (6,172) | 1,189 |
|   Interest and Dividend Income | (3,127) | (5,264) | (9,296) | (23,981) |
|   Other Income | - | - | - | - |
| Total Other (Income)/Expense | 68 | (8,893) | (15,468) | (22,792) |
| (Loss)/Income Before Income Taxes | (1,177,644) | 310,155 | (3,193,571) | (2,207,707) |
| Income Tax Benefit | - | - | - | - |
| Net (Loss)/Income Attributable to Common Stockholders | (1,177,644) | 310,155 | (3,193,571) | (2,207,707) |
| Other Comprehensive Income/(Loss) | | | | |
|   Net Unrealized Gain/(Loss) on Marketable Securities | (1,009) | (2,837) | - | 3,691 |
| Total Other Comprehensive Income/(Loss) | (1,009) | (2,837) | - | 3,691 |
| Comprehensive (Loss)/Income | $ (1,178,653) | $ 307,318 | $ (3,193,571) | $ (2,204,016) |
|   Basic income/(loss) per common share | $ (0.13) | $ 0.06 | $ (0.39) | $ (0.41) |
|   Diluted income/(loss) per common share | $ (0.13) | $ 0.06 | $ (0.39) | $ (0.41) |
|   Weighted average basic common shares outstanding | 8,892,079 | 5,434,212 | 8,268,851 | 5,428,859 |
|   Weighted average diluted common shares  outstanding | 8,892,079 | 5,508,545 | 8,268,851 | 5,428,859 |

106. The Q3 2017 10-Q provided the following breakdown of revenue by product lines:

| Product Lines | 3 Months Ended September 30, 2017 | 3 Months Ended September 30, 2016 | Percent Change |
|---|---|---|---|
| Particle ImmunoFiltration Assay ("PIFA") | $    490,058 | $    514,839 | (5)% |
| MicroParticle Catalyzed Biosensor ("MPC") | 104,094 | 85,338 | 22% |
| Rapid Enzymatic Assay ("REA") | 27,500 | - | 100% |
| Other | 16,679 | 13,021 | 28% |
| Total Product Revenue | 638,331 | 613,198 | 4% |
| License & Service Revenue | 37,500 | - | 100% |
| Total Revenue | $    675,831 | $    613,198 | 10% |

107. The Q3 2017 10-Q provided the following breakdown of revenue by geographic region:

| Geographic Region | 3 Months Ended September 30, 2017 | 3 Months Ended September 30, 2016 | Percent Change |
|---|---|---|---|
| United States | $    626,077 | $    603,006 | 4% |
| People's Republic of China | - | 383 | (100)% |
| Rest of World | 49,754 | 9,809 | 407% |
| Total Revenue | $    675,831 | $    613,198 | 10% |

108. The Q3 2017 10-Q contained the following statements regarding the Company's internal controls:

**Item 4. Controls and Procedures.**

*(a) Evaluation of Disclosure Controls and Procedures.*

Pursuant to Rule 13a- 15(b) under the Exchange Act, the Company carried out an evaluation, with the participation of the Company's management, including the Company's Principal Executive Officer ("PEO") and Principal Financial Officer ("PFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined under Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report.

As of September 30, 2017 and based upon that evaluation, the Company's PEO and PFO concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports

that the Company files or submits under the Exchange Act, are recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Company's PEO and PFO, as appropriate, to allow timely decisions regarding required disclosure.

*(b) Changes in Internal Control over Financial Reporting.*

There were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

109.    Attached to the Q3 2017 10-Q were SOX certifications signed by Defendants Gormally and Rauch, attesting to the accuracy of the Q3 2017 10-Q.

110.    On November 15, 2017, the Company held a conference call with analysts and investors to discuss its financial results for the quarter ended September 30, 2017. During the call, Defendant Gormally stated that "both 3Q and year-to-date revenues were up 10% and our gross profit year-to-date was up 6% demonstrating the continued positive trajectory towards the profitability."

111.    The Company also issued a press release on November 15, 2017, titled "Akers Biosciences Announces Q3 2017 Earnings," noting in the subheading: "*Revenues up 10% as Breathalyzers and Cholesterol Tests Begin to Contribute*." The press release stated provided the following highlights for the quarter regarding revenue:

**Q3 and 9M Financial Highlights:**

- Q3 Total Revenue up 10% to $675,831 (Q3 2016: $613,198)

    o   9M Total Revenue up 10% to $2,540,942 (9M 2016: $2,307,708)

112.    The November 15, 2017 press release quoted Defendant Gormally as stating:

Total Revenues were up by 10% in the third quarter as increasing sales of the Company's breathalyzer products and rapid cholesterol tests complemented the robust, albeit plateaued, core revenues from our flagship rapid test for heparin-induced thrombocytopenia (HIT).

113.    Regarding revenues, the November 15, 2017 press release stated, in relevant part:

Akers' revenue for the nine months ended September 30, 2017 totaled $2,540,942, a 10% increase from the same period in 2016.

Revenue from the Company's PIFA Heparin/PF4 Rapid Assay products decreased 27% during the nine months ended September 30, 2017 over the same period of 2016. Additional revenue from PIFA related components, totaling $500,000, during the nine months ended September 30, 2017 is included in other revenue. During the nine months ended September 30, 2016 the Company recognized approximately $494,000 (2017: $-) in PIFA revenue from the Company's distribution partner in the People's Republic of China ("PRC").

* * *

Other operating revenue increased to $616,647 (2016: $83,573) during the nine months ended September 30, 2017 as compared to the same period of 2016. The product group consists of fees received for shipping and handling and the sale of components. The significant increase resulted from an initial order, as explained above, for manufacturing components from NovoTek totaling $500,000. NovoTek will utilize these components along with additional materials to be purchased in a future period to assemble PIFA Heparin/PF4 products in either the PRC or Poland.

During August 2017, the Company received a non-refundable $50,000 fee from a potential customer for the Company's BreathScan OxiChek products in exchange for the use of equipment, access to product documentation and data, technical support and to restrict the Company from actively pursuing another commercial partner in a specific market segment.

The Company recognized $37,500 of this fee as License & Service Revenue during the three months ended September 30, 2017 and will recognize the balance of $12,500 in the three months ended December 31, 2017.

114.    The Company filed a Form NT 10-K with the SEC on April 3, 2018, in which the

Company asserted that it "was unable, without unreasonable effort or expense, to file its Annual

Report on Form 10-K for the period ended December 31, 2017 ("Form 10-K") by April 2, 2018.

The Company requires additional time to gather information and finalize its financial statements."

The Form NT 10-K also outlined the revenues that the Company expected to report from various

business activities, including a 31% increase in product revenue compared to the prior year, a

237% increase in MPC product sales, and a 476% increase in "other operating revenue."

115.    Also on April 3, 2018, the Company filed its annual report for the fiscal year ended December 31, 2017 with the SEC on Form 10-K (the "2017 10-K"). The 2017 10-K was signed by Defendants Gormally, Rauch, Schreiber, White, and Tarbox—Defendant Akers' signature is notably absent from the 2017 10-K.

116.    Regarding the Company's internal controls, the 2017 10-K stated that:

[W]e identified a material weakness in our controls related to segregation of duties and other immaterial weaknesses in several areas of data management and documentation.

The Company's management is composed of a small number of professionals resulting in a situation where limitations on segregation of duties exists. Accordingly, as a result of the material weakness identified above, we have concluded that the control deficiencies result in a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented on a timely basis by the Company's internal controls. The addition of the Financial Controller will allow the Company to implement the recommended changes to our internal control procedures that were updated or developed with the assistance of an independent accounting firm in 2015-16. Implementation of these procedures will be completed during 2018.

While the material weakness set forth above were the result of the scale of our operations and are intrinsic to our small size, ***the Company believes the risk of material misstatements relative to financial reporting are minimal***.

\* \* \*

*(c) Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

117.    The 2017 10-K reported the following revenue for the fiscal year ended December 31, 2017:

*Revenue*

The Company's total revenue for the year ended December 31, 2017 was $3,929,527, a 33% increase compared to the same period in 2016. The table below

presents a summary of our sales by product line:

| Product Line | Year Ended December 31, 2017 | | Year Ended December 31, 2016 | | Percent Change |
|---|---|---|---|---|---|
| Particle ImmunoFiltration Assay ("PIFA") | $ | 2,232,684 | $ | 2,577,148 | (13)% |
| MicroParticle Catalyzed Biosensor ("MPC") | | 950,946 | | 282,516 | 237% |
| Rapid Enzymatic Assay ("REA") | | 133,848 | | - | -% |
| Other | | 562,049 | | 97,498 | 476% |
| Product Revenue Total | $ | 3,879,527 | $ | 2,957,162 | 31% |
| License & Service Fees | | 50,000 | | 3,750 | 1,233% |
| Total Revenue | $ | 3,929,527 | $ | 2,960,912 | 33% |

118.    The 2017 10-K also reported the following revenue by geographic region:

| Geographic Region | Year Ended December 31, 2017 | | Year Ended December 31, 2016 | | Percent Change |
|---|---|---|---|---|---|
| United States | $ | 2,861,613 | $ | 2,330,723 | 23% |
| People's Republic of China | | 627,132 | | 502,998 | 25% |
| Rest of World | | 440,782 | | 127,191 | 247% |
| Total Revenue | $ | 3,929,527 | $ | 2,960,912 | 33% |

119.    Regarding the Company's revenue recognition practices, the 2017 10-K stated, in relevant part:

**(k) Revenue Recognition**

In accordance with FASB ASC 605, the Company recognizes revenue when (i) persuasive evidence of a customer or distributor arrangement exists, (ii) a retailer, distributor or wholesaler receives the goods and acceptance occurs, (iii) the price is fixed or determinable, and (iv) the collectability of the revenue is reasonably assured. Subject to these criteria, the Company recognizes revenue from product sales when title passes to the customer based on shipping terms. The Company typically does not accept returns nor offer charge backs or rebates except for certain distributors. Revenue recorded is net of any discount, rebate or sales return. The accrual for estimated sales returns was $- as of December 31, 2017 and 2016.

The Company implemented a standard dealer cost model during the year ended December 31, 2016 which includes a provision for rebates to the distributors under limited circumstances. The Company established an accrual of $126,471 and $41,120, which is a reduction of revenue as of December 31, 2017 and 2016. Accounts receivable will be reduced when the rebates are applied by the customer. The Company recognized $372,664 and $471,949 during the years ended

December 31, 2017 and 2016 for rebates, which is included as a reduction of product revenue in the Consolidated Statement of Operations and Comprehensive Loss.

License fee revenue is recognized on a straight-line basis over the term of the license agreement.

When the Company enters into arrangements that contain more than one deliverable, the Company allocates revenue to the separate elements under the arrangement based on their relative selling prices in accordance with FASB ASC 605-25.

120.    Attached to the 2017 10-K were SOX certifications signed by Defendants Gormally and Rauch, attesting to the accuracy of the 2017 10-K.

121.    The Company held and conference call with analysts and investors on April 3, 2018 to discuss its earnings for the quarter and year ended December 31, 2017. During the call, Defendant Gormally made the following statements regarding the Company's revenues:

OxiChek is a part of the MPC Biosensor platform family of proprietary breath testing technology. MPC sales grew overall by 237% to just under $1 million and were a major contributor sales growth over prior year.

It is also notable that sales of BreathScan Alcohol Breathalyzer products, another commercialized product in this category enjoyed a stronger year, boosted by a $0.25 million initial stocking order from Australia and New Zealand.

* * *

Moving on to our main revenue generator today, the test which accounts for around 70% of revenues in 2017, including associated component sales is our rapid antibody test for an allergy to a widely-used blood thinner, heparin. Now this test is called the PIFA Heparin/PF4 Rapid Assay. . . . Although we reported only moderate revenue growth of 6% in sales on these tests or the related components, we remain encouraged with our future.

122.    Defendant Rauch made the following statements regarding the Company's revenue during the call:

Total revenue was up by a third to just shy $4 million during 2017. PIFA Heparin/PF4 Rapid Assay products or components associated with that product continue to account for majority of that revenue. However, the growth over 2017 was driven primarily by the BreathScan Alcohol Breathalyzers, OxiChek and the

re-introduction of the Tri-Cholesterol test.

123.    The Company also issued a press release on April 3, 2018, reporting its earnings

for fiscal year 2017. The press release stated, in relevant part:

2017 Financial Highlights:
- Total revenue up 33% to $3,929,527 (2016: $2,960,912)
- PIFA Heparin/PF4 Rapid Assay products continue to account for the majority of revenues – however, growth was driven primarily by BreathScan Alcohol Breathalyzers, BreathScan OxiChek™ and the re-introduced Tri-Cholesterol test
- Total revenue up across all geographic regions
  - USA: 23%
  - China: 25%
  - Rest of World: 247%

* * *

Product revenue increased by 31% to $3,879,527 (2016: $2,957,162) during the year ended December 31, 2017 driven primarily by sales of BreathScan Alcohol Breathalyzers, BreathScan OxiChek™ and the Company's re-introduced Tri-Cholesterol products. License and service fees increased to $50,000 (2016: $3,750), the result a fee from a potential customer for the Company's BreathScan OxiChek™ products in exchange for the use of equipment, access to product documentation and data, technical support and to restrict the Company from actively pursuing another commercial partner in a specific market segment.

Revenue from the Company's PIFA Heparin/PF4 Rapid Assay products decreased 13% to $2,232,684 (2016: $2,577,148) during the year ended December 31, 2017 over the same period of 2016. Additional revenue from PIFA -related components, totaling $500,000, during the year ended December 31, 2017 is included in other revenue.

124.    The April 3, 2018 press release contained tables providing the same overviews of

revenues by product category and geographic region as contained in the 2017 10-K.

125.    The statements referenced in ¶¶ 85-89 and 95-124 above were materially false and

misleading because the Individual Defendants caused the Company to make false and misleading

statements, in addition to failing to disclose material adverse facts about Akers' business,

operational and compliance policies. Specifically, those statements were false and misleading and

failed to disclose that: (1) the Company improperly recognized revenue during the fiscal year

ended December 31, 2017 in violation of GAAP; (2) the Company failed to disclose the true extent of weaknesses in its internal controls over financial reporting, and actively downplayed such weaknesses; and (3) as a result, the Individual Defendants' statements about the Company's business, operations and prospects were materially false and misleading or lacked a reasonable basis at all relevant times.

126.     In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

127.     Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

128.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

### The Truth Begins to Emerge

129.     On May 16, 2018 the Company filed a Form NT 10-Q, disclosing that it would be unable to timely file its periodic report for the quarter ended March 31, 2018, asserting that "[t]he Company requires additional time to review the characterization of certain revenue recognition items for this quarter and for the auditors to complete their pre-filing procedures and finalize its financial statements."

130.     In response to this news, the price per share of Akers stock dropped $0.021, or nearly 4%, from its May 16, 2018 closing price, to close at $0.509 on May 17, 2018.

131.    The Company filed a Form 8-K with the SEC on May 21, 2018, which provided further disclosure regarding the Company's inability to timely file its periodic report for the quarter ended March 31, 2018. The Form 8-K stated:

> As previously disclosed, ***the Company has been reviewing the characterization of certain revenue recognition items for the quarter ended March 31, 2018***. As ***this review is continuing and now includes certain transactions in previous quarters***, the Company is unable to file its 10-Q for the quarter ended March 31, 2018 today. Following the completion of its review, which cannot be estimated, the Company will file its 10-Q for the quarter ended March 31, 2018 and make a determination as to whether it will need to revise, correct or restate the reports for any previous quarter or fiscal year.

(Emphasis added.)

132.    On this news, the price per share of Akers stock dropped $0.058, or nearly 9%, from its May 21, 2018 closing price, to close at $0.599 on May 22, 2018.

133.    On May 25, 2018, the Company filed a Form 8-K with the SEC revealing that the Company had received a letter from the Listing Qualifications Department of the NASDAQ Stock Market LLC that informed the Company it was no longer in compliance with the rules for continued listing because of the Company's failure to timely file its Form 10-Q for the fiscal quarter ended March 31, 2018 (the "NASDAQ Letter"). The NASDAQ Letter informed the Company that it was required to submit a plan to regain compliance within 60 days of the date of the notice.

134.    On May 29, 2018, the Company issued a press release, "announc[ing] that Raymond F. Akers Jr., Ph.D has resigned as a director of the Company with immediate effect."

135.    On this news, the price per share of Akers stock dropped $0.198, or over 33%, from its May 25, 2018 closing price, to close at $0.391 on May 29, 2018.[8] The price continued to drop the following day, closing at $0.326 per share on May 30, 2018, a drop of $0.166, or over 16%.

---

[8] Markets were closed on Monday, May 28, 2018 in observance of Memorial Day.

136.    On June 1, 2018, the Company filed a Form 8-K with the SEC providing further information regarding Defendant Akers' resignation (the "June 1, 2018 8-K"). The June 1, 2018 8-K specifically noted that the Company believed that Defendant Akers had resigned due to significant differences with other members of the Board, and that Defendant Akers had not "been fully cooperative" with the Company's review of certain revenue recognition items. The Form 8-K stated, in relevant part:

> On May 27, 2018, Raymond F. Akers, Jr., submitted his written resignation (the "Resignation Letter") from Akers Biosciences, Inc.'s (the "Company") board of directors (the "Board") effective immediately. Dr. Akers did not state in the Resignation Letter that he had any disagreement with the Company. Dr. Akers thereafter delivered a letter, dated May 30, 2018 (the "Disagreement Letter"), setting forth his disagreements with the Company. A copy of the Resignation Letter and the Disagreement Letter are attached hereto as Exhibit 17.1 and Exhibit 17.2 respectively.
>
> **The Company believes that Dr. Akers resigned due to his significant differences with other members of the Board regarding the management of the Company, its accounting and business practices and its counsel**.
>
> As previously disclosed the Company's audit committee of **the Board has been reviewing certain revenue recognition items with respect to the first quarter of 2018, as well as previous quarters. The Company believes Dr. Akers has not been fully cooperative in connection with such review.**
>
> In accordance with the requirements of Item 5.02(a) of Current Report on Form 8-K, the Company has provided Dr. Akers with the opportunity to furnish the Company as promptly as possible with a letter addressed to the Company stating whether he agrees with the statements made by the Company in response to this Item 5.02 and, if not, stating the respects in which he does not agree.

(Emphasis added).

137.    The June 1, 2018 8-K included a letter from Defendant Akers, dated May 30, 2018. The letter stated that Defendant Akers had "resigned from the Board of Directors due to significant differences regarding the policies and practices of the Board of Directors, accounting and business practices of Management, and new Counsel." The letter stated, in relevant part:

> Dear Sirs,

> I have resigned from the Board of Directors due to significant differences regarding the policies and practices of the Board of Directors, accounting and business practices of Management, and new Counsel. I believe this to be in the best interests of the Company, shareholders, and me.
> Very truly yours,
> Raymond F. Akers, Jr., Ph.D.
> Co-Founder

138.    The Company filed a Form 8-K/A on June 5, 2018, amending the June 1, 2018 8-K to include a letter that Defendant Akers had sent, through counsel, to respond to the June 1, 2018 8-K. The letter, which was attached as an exhibit to the Form 8-K/A, asserted that the June 1, 2018 8-K was "false" and "totally misleading." The letter stated, in relevant part:

> On behalf of Ray Akers, we believe the language of the 8K regarding Ray is false, totally misleading, and such that will cause Ray to have to take corrective action. Ray is a whistleblower; the only reason there is an investigation regarding revenue recognition is because Ray refused to approve the 10K for 2017 and demanded an investigation. To say he is being "uncooperative" is utterly disingenuous and will not be tolerated.
>
> George Bochetto, Esq.
> Bochetto & Lentz, P.C.
> 1524 Locust Street
> Philadelphia, PA 19102
> (Ph) 215-735-3900
> (Fx) 215-735-2455
> www.bochettoandlentz.com

139.    In response to this news, the price per share of Akers stock dropped $0.025, or over 5%, from its June 5, 2018 closing price, to close at $0.46 on June 6, 2018.

140.    On June 19, 2018, the Company filed a Form 8-K with the SEC revealing that the Company's 2017 10-K, Q3 2017 10-Q, and Q2 2017 10-Q should not be relied upon. The Form 8-K stated, in relevant part:

> On June 18, 2018, the Audit Committee of the Board of Directors (the "**Audit Committee**") was advised by the Company's independent registered public accounting firm, Morison Cogen LLP ("**Morison**"), that the following previously filed financial statements of the Company should not be relied upon:

(i)     The Company's audited consolidated financial statements for the fiscal year ended December 31, 2017, contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, originally filed with the Securities and Exchange Commission ("**SEC**") on April 3, 2018 (the "**Annual Report**"),

(ii)    The Company's unaudited financial statement for the quarterly period ended September 30, 2017, contained in the Company's Quarterly Report on Form 10-Q, originally filed with the SEC on November 14, 2017 (the "**Q3 Report**"); and

(iii)   The Company's unaudited financial statement for the quarterly period ended June 30, 2017, contained in the Company's Quarterly Report on Form 10-Q, originally filed with the SEC on August 14, 2017 (the "**Q2 Report**", which along with the Q3 Report and the Annual Report are referred to herein as the "**Reports**").

***Subsequent to the filing of the Annual Report certain information came to the attention of the Audit Committee that certain 2017 revenue transactions did not qualify for revenue recognition under generally accepted accounting principles.*** The Audit Committee is overseeing an investigation of these matters with assistance of Morison, outside counsel and forensic accountants.

***The Company will, as soon as is practicable, make the appropriate adjustments to the above referenced Reports by filing with the SEC amendments to the Reports which, in each case, will include restated consolidated financial statements and notes thereto and any other appropriate revisions.***

(Bold emphasis in original. Bold & italic emphasis added.)

141.    On June 29, 2018 the Company filed a press release announcing that it had requested that trading of its shares on the London Stock Exchange be suspended from "July 2, 2018 pending publication of revised annual audited accounts for 2017, following which the Company will request the suspension to be lifted" due to the Company's inability to publish a revised annual report for the year ended December 31, 2017 within six months of that date under that exchange's rules.

142.    On July 13, 2018 the Company issued amended versions of its Q2 2017 10-Q (the "Q2 2017 10-Q/A"), Q3 2017 10-Q (the "Q3 2017 10-Q/A"), and 2017 10-K (the "2017 10-K/A"). The Q2 2017 10-Q/A provide the following explanation of the impact of the accounting issues:

As previously disclosed, the Company determined that certain revenue transactions did not qualify for revenue recognition under generally accepted accounting principles. In the process of this determination, *the Company discovered information that existed at June 30, 2017 which affected the revenue and an obligation. The Company concluded that the impact of applying corrections for these errors and misstatements on the condensed consolidated financial statements as of and for the three and six months ended June 30, 2017 is material*. As a result, the Company is restating its condensed consolidated financial statements for the periods impacted. See below for a reconciliation of the previously reported amounts to the restated amounts.

The table below sets forth the consolidated balance sheets, including the balances originally reported, corrections and the as restated balances:

| | As of June 30, 2017 | | |
| --- | --- | --- | --- |
| | As Reported | Correction | As Restated |
| Trade Receivables – Related Party, net | $ 125,001 | $ (125,001) | $ - |
| Inventories, net | 2,166,699 | 62,140 | 2,228,839 |
| Total Current Assets | 4,906,089 | (62,861) | 4,843,228 |
| Total Assets | 6,562,562 | (62,861) | 6,499,701 |
| Trade and Other Payables | 1,413,141 | 88,500 | 1,501,641 |
| Total Current Liabilities | 1,447,052 | 88,500 | 1,535,552 |
| Total Liabilities | 1,447,052 | 88,500 | 1,535,552 |
| Accumulated Deficit | (99,495,455) | (151,361) | (99,646,816) |
| Total Stockholder's Equity | 5,115,510 | (151,361) | 4,964,149 |
| Total Liabilities and Stockholders' Equity | 6,562,562 | (62,861) | 6,499,701 |

(Emphasis added.)

143.   The Q2 2017 10-Q/A continued, providing a table illustrating the impact of the restatement on the Company's income:

| | For the three months ended June 30, 2017 | | |
| --- | --- | --- | --- |
| | As Reported | Correction | As Restated |
| Product revenue | $ 1,097,295 | $ (370) | $ 1,096,925 |
| Product revenue – Related party | 100,567 | (124,631) | (24,064) |
| Product Cost of Sales | (264,231) | (26,360) | (290,591) |
| Gross Income | 933,631 | (151,361) | 782,270 |
| Loss from Operations | (669,301) | (151,361) | (820,662) |
| Loss Before Income Taxes | (666,647) | (151,361) | (818,008) |
| Net Loss Attributable to Common Stockholders | (666,647) | (151,361) | (818,008) |
| Comprehensive Loss | (665,795) | (151,361) | (817,156) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Loss per share | $ | (0.08) | $ | (0.01) | $ | (0.09) |

144.   The Q3 2017 10-Q/A stated, in relevant part: "There is no impact on the condensed consolidated financial statements for the three months ended September 30, 2017."

145.   Regarding the impact of the restatement, the 2017 10-K/A stated, in relevant part:

As previously disclosed, the Company determined that certain revenue transactions did not qualify for revenue recognition under generally accepted accounting principles. In the process of this determination, *the Company discovered information that existed at December 31, 2017 which affected the revenue, certain obligations and the value of certain inventory items reported in the year ended December 31, 2017. The Company concluded that the impact of applying corrections for these errors and misstatements on the consolidated financial statements as of and for the year ended December 31, 2017 is material*. As a result, the Company is restating its consolidated financial statements as of and for the year ended December 31, 2017. See below for a reconciliation of the previously reported amounts to the restated amounts.

The table below sets forth the consolidated balance sheets, including the balances originally reported, corrections and the as restated balances:

| | As of December 31, 2017 | | |
|---|---|---|---|
| | As Reported | Correction | As Restated |
| Trade Receivables, net | $      1,490,985 | $      (526,314) | $      964,671 |
| Trade Receivables – Related Party, net | 125,001 | (125,001) | - |
| Inventories, net | 1,845,281 | (897,669) | 947,612 |
| Total Current Assets | 9,324,883 | (1,548,984) | 7,775,899 |
| Total Assets | 10,886,874 | (1,548,984) | 9,337,890 |
| Trade and Other Payables | 1,733,216 | 12,000 | 1,745,216 |
| Total Current Liabilities | 1,773,037 | 12,000 | 1,785,037 |
| Total Liabilities | 1,773,037 | 12,000 | 1,785,037 |
| Accumulated Deficit | (103,284,863) | (1,560,984) | (104,845,847) |
| Total Stockholder's Equity | 9,113,837 | (1,560,984) | 7,552,853 |
| Total Liabilities and Stockholders' Equity | 10,886,874 | (1,548,984) | 9,337,890 |

(Emphasis added.)

146.   The 2017 10-K/A then provided the following table summarizing the impact of the restatement on the Company's consolidated statements of income:

| | For the year ended December 31, 2017 | | |
|---|---|---|---|
| | As Reported | Correction | As Restated |

| | | | |
|---|---|---|---|
| Product revenue | $ 3,754,896 | $ (450,184) | $ 3,304,712 |
| Product revenue – Related party | 124,631 | (124,631) | - |
| Product Cost of Sales | (1,419,963) | (986,169) | (2,406,132) |
| Gross Income | 2,509,564 | (1,560,984) | 948,580 |
| Loss from Operations | (5,052,806) | (1,560,984) | (6,613,790) |
| Loss Before Income Taxes | (5,805,326) | (1,560,984) | (7,366,310) |
| Net Loss Attributable to Common Stockholders | (5,805,326) | (1,560,984) | (7,366,310) |
| Comprehensive Loss | (5,805,326) | (1,560,984) | (7,366,310) |
| Loss per Share | (0.61) | (0.17) | (0.78) |

147.   The 2017 10-K/A then provided the following tables demonstrating the impact of

the restatement on the Company's consolidated statements of shareholders equity and cash flows:

The table below sets forth the consolidated statements of shareholders' equity, including the balances originally reported, corrections and the as restated balances:

| | As Reported | Correction | As Restated |
|---|---|---|---|
| Net loss, for the year ended December 31, 2017 | $ (5,805,326) | $ (1,560,984) | $ (7,366,310) |
| Accumulated Deficit, as of December 21, 2017 | (103,284,863) | (1,560,984) | (104,845,847) |
| Total Equity, as of December 31, 2017 | 9,113,837 | (1,560,984) | 7,552,853 |

The table below sets forth the consolidated statements of cash flows from operating activities, including the balances originally reported, corrections and the as restated balances:

| | For the year ended December 31, 2017 | | |
|---|---|---|---|
| | As Reported | Correction | As Restated |
| Net loss | $ (5,805,326) | $ (1,560,984) | $ (7,366,310) |
| Reserve and write-off for absolute inventory | 26,122 | 1,182,400 | 1,208,522 |
| Increase in trade receivables | (1,339,714) | 526,314 | (813,400) |
| (Increase)/decrease in trade receivables – related party | (93,109) | 125,001 | 31,892 |
| Increase/(decrease) in inventories | 165,118 | (284,731) | (119,613) |
| Increase/(decrease) in trade and other payables | 269,853 | 12,000 | 281,853 |
| Net cash used in operating activities | 5,080,412 | - | 5,080,412 |

The restatement had no impact on cash flows from investing activities or financing activities.

148.    On July 26, 2018, the Company issued a press release announcing that its temporary suspension from the London Stock Exchange had been lifted as of that date.

149.    On November 7, 2018, the Company issued a press release announcing its intention to "Explore Strategic Alternatives." The press release clarified that such "potential strategic alternatives include[e], but [are] not limited to, business combinations." Further, the press release announced a 1 for 8 reverse stock split, effective November 8, 2018, effectuated in an attempt to comply with NASDAQ's minimum bid price requirements.

150.    On November 8, 2018,  Alliance News reported that trading in Aker's stock had been suspended on the London Stock Exchange following the reverse stock split. It was reported that the Company was working to get its consolidated shares re-admitted to the London Stock Exchange, and anticipated that the process would take five to seven business days.

## DAMAGES TO AKERS

151.    As a direct and proximate result of the Individual Defendants' conduct, Akers has lost and will continue to lose and expend many millions of dollars.

152.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Actions filed against the Company, its CEO and its PFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

153.    Further, these expenditures include the costs of the investigation into certain revenue recognition items overseen by the Audit Committee, and the costs of restating the Company's 2017 10-K, Q3 2017 10-Q, and Q2 2017 10-Q.

154.     Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

155.     As a direct and proximate result of the Individual Defendants' conduct, Akers has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

156.     Plaintiff brings this action derivatively and for the benefit of Akers to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Akers, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as the aiding and abetting thereof.

157.     Akers is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

158.     Plaintiff is, and has been at all relevant times, a shareholder of Akers. Plaintiff will adequately and fairly represent the interests of Akers in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

159.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

160.    A pre-suit demand on the Board of Akers is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following three individuals: Defendants Schreiber and White (the "Director-Defendants") and non-party Joshua Silverman (together with the Director-Defendants, the "Directors").

161.    Plaintiff needs only to allege demand futility as to two of the three Directors who are on the Board at the time this action is commenced.

162.    Demand is excused as to both of the Director-Defendants because each one of them face, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

163.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

164.    Demand is excused because while and after the Director-Defendants breached their fiduciary duties as set forth herein, they caused the Company to violate New Jersey law by failing to hold an annual stockholders' meeting since August 7, 2017, thus preventing the stockholders from having the opportunity to elect a Board of Directors that was not breaching its fiduciary duties to the Company and its stockholders.

165.     Additional reasons that demand on Defendant White is futile follow. Defendant White has served as a Company director since August 2017, and Chairs the Audit Committee. As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant White also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. For these reasons, Defendant White breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.     Additional reasons that demand on Defendant Schreiber is futile follow. Defendant Schreiber has been a Company director since August 2017 and is a member of the Audit Committee. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Schreiber also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. For these reasons, Defendant Schreiber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.     Additional reasons that demand on the Board is futile follow.

168.     The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best

interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

169.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, and conduct business in an honest and ethical manner. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

170.    Director-Defendants White and Schreiber breached their fiduciary duties as members of the Audit Committee at the time that the false and misleading statements alleged above were made. The Audit Committee charter requires that the Committee monitor the integrity of the Company's financial reporting process, systems of internal control regarding finance, accounting and legal compliance, monitor compliance with legal and regulatory requirements, and review the Company's annual audited financial statements prior to distribution, among other things. As members of the Audit Committee, Director-Defendants White and Schreiber breached their fiduciary duties by failing to ensure that revenue was properly recognized in compliance with GAAP, resulting in an investigation overseen by the Audit Committee and by allowing the Company to make the improper statements discussed above. Indeed, each of the periodic reports which the Company indicated could no longer be relied upon in its June 19, 2018 Form 8-K, and

subsequently amended on July 13, 2018, were filed under the oversight of Director-Defendants White and Schreiber as members of the Audit Committee. Thus, Director-Defendants White and Schreiber each face a substantial likelihood of liability arising from their breaches of fiduciary duties, and, therefore, any demand upon them is futile.

171.    Akers has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Akers any part of the damages Akers suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

172.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

173.    The acts complained of herein constitute violations of fiduciary duties owed by Akers' officers and directors, and these acts are incapable of ratification.

174.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Akers. If there is a directors' and officers'

liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Akers, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

175.    If there is no directors' and officers' liability insurance, then the Directors will not cause Akers to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

176.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least two of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

177.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

179.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

181.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the Company improperly recognized revenue during the fiscal year ended December 31, 2017 in violation of GAAP; (2) the Company failed to disclose the true extent of weaknesses in its internal controls over financial reporting, and actively downplayed such weaknesses; and (3) as a result, the Individual Defendants' statements about the Company's business, operations and prospects were materially false and misleading or lacked a reasonable basis at all relevant times.

182.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-

performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

183.    The 2017 Proxy Statement also made reference to the Company's Code of Ethics. The Code of Ethics required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, and conduct business in an honest and ethical manner. By issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Ethics. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Ethics were being violated.

184.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

185.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendant Akers, and the election of Defendants Gormally, White, Tarbox, and Schreiber, which allowed Defendants Akers and Gormally to continue breaching their fiduciary duties to Akers, and allowed Defendants White, Tarbox and Schreiber to begin breaching their fiduciary duties to Akers.

186.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

187.    Plaintiff, on behalf of Akers, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

188.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Akers' business and affairs.

190.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

191.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Akers.

192.    In breach of New Jersey law and their fiduciary duties owed to Akers, the Individual Defendants have caused the Company to fail to hold an annual meeting of the stockholders for over 13 months.

193.    In breach of their fiduciary duties owed to Akers, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company improperly recognized revenue during the fiscal year ended December 31, 2017 in violation of GAAP; (2) the Company failed to disclose the true extent of weaknesses in its internal controls over financial reporting, and

actively downplayed such weaknesses; and (3) as a result, the Individual Defendants' statements about the Company's business, operations and prospects were materially false and misleading or lacked a reasonable basis at all relevant times.

194.   The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

195.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

196.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Akers' securities.

197.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Akers' securities.

The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

198.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Akers has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff on behalf of Akers has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Akers.

203.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses, stock options, or similar compensation from Akers that was tied to the performance or artificially inflated valuation of Akers, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

204.    Plaintiff, as a shareholder and a representative of Akers, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and due to their wrongful conduct and breach of their fiduciary and contractual duties.

205.    Plaintiff on behalf of Akers has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

208.    As a result of the failures of internal control and resulting financial misstatements, the Individual Defendants have caused the Company to incur costs associated with the investigation into such misstatements and the restatement of two quarterly reports and one annual report.

209.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Akers to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

210.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

211.    Plaintiff on behalf of Akers has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Akers, and that Plaintiff is an adequate representative of the Company;

(b)      Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Akers;

(c)      Determining and awarding to Akers the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Akers and the Individual Defendants to hold an annual meeting of the stockholders;

(e)      Directing Akers and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Akers and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Akers to nominate at least two candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(f)      Awarding Akers restitution from Individual Defendants, and each of them;

(g)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(h)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 8, 2018                    Respectfully submitted,

**PAWAR LAW GROUP P.C.**


/s/ Vik Pawar
Vik Pawar, Esq.
20 Vesey Street, Suite 1210
New York, New York 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

*Local Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*